UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARIA ARANDA,<br><br>    Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>    Defendant. | CASE NO: 1:17-cv-5449<br><br><br>Hon. Magistrate Judge Cole |

**PLAINTIFF'S MOTION, AND MEMORANDUM IN SUPPORT THEREEOF, FOR SUMMARY JUDGEMENT, OR IN THE ALTERNATIVE, FOR REMAND**

Plaintiff, Maria Aranda, files her Motion and Memorandum in Support Thereof, for Summary Judgement, seeking reversal of the final decision of Defendant Commissioner denying her application for a period of disability, Social Security Disability Insurance under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Social Security Act. In the alternative, Ms. Aranda prays for remand of her claim to the Commissioner for proper determination.

**I.**     **Statement of the Case**

    **a. Procedural History/Exhaustion of Remedies**

Plaintiff, Maria Aranda, filed for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) with the Social Security Administration on June 30, 2014. (R. 173, 175), with a protective filing date of May 1, 2014. (R. 17.) Ms. Aranda's claim was

denied at the initial level on October 16, 2014, (R. 111) and on reconsideration on March 9, 2015. (R. 116.)

A hearing was held on April 29, 2016, with Administrative Law Judge (ALJ) Lana Johnson. (R. 17). Ms. Aranda was represented by Attorney James Brzezinski at the hearing. (Id.) Richard T. Fisher, a vocational expert (VE), testified at the hearing as to the physical and mental skills required to perform various jobs in the national economy. (Id). In addition, Sai R. Nimmagadda, M.D., testified as a medical expert. (Id.)

ALJ Johnson issued an unfavorable decision on July 22, 2016. (R. 14). Ms. Aranda appealed the ALJ's decision on August 19, 2016. (R. 172). Ms. Aranda retained the undersigned on February 18, 2015. (R. 14).

The Appeals Council denied Ms. Aranda's Request for Review of Hearing Decision/Order on May 26, 2017. (R. 1). The undersigned filed this action before the Court on July 25, 2017. (ECF No. 1).

**b. Claimant's History**

Ms. Aranda's date of birth is September 12, 1967. (R. 89). She alleges she became too disabled to work as of February 28, 2014, which is her alleged onset date for purposes of applying for disability benefits. (Id). Her age was 46 years 5 months at this time (Id.) Ms. Aranda last worked as a property manager in 2014, which was described as light skilled work by the vocational expert (R. 64). Ms. Aranda has not had any earnings since 2014. (R. 212).

### c. Overview of Claimant's Disability

The ALJ found that Ms. Aranda has the following severe impairments: bilateral carpal tunnel syndrome and osteoarthritis, and obesity. (R. 19)

### d. Work History

Ms. Aranda has past relevant work as a property manager which is light with an SVP of 5, and receptionist, which is sedentary with an SVP of 4 (R. 64).

### e. Medical Treatment and Evaluation Records

Ms. Aranda attended an EMG on 1/7/13 which demonstrated bilateral median neuropathy, worse on the right. (R. 418.)

On 2/10/13, Ms. Aranda presented for a follow up of her EMG. She described worsening hand pain and numbness for the previous few months. She noted that symptoms occur when lifting, driving, doing her hair, or using the phone. (R. 446.) She was given injections and instructed to wear a brace. (R. 448.)

In a treatment note dated 4/14/13 Ms. Aranda was seen for a follow up from carpel tunnel injections six weeks prior. She noted that her pain and numbness had returned and she had triggering in the left long finger, which was painful. (R. 325.) Injections for the trigger finger recommended, however due to the temporary relief provided by carpal tunnel injections, these were not recommended again. Surgery was instead recommended. (R. 326.)

On 5/8/13, Ms. Aranda had right carpal tunnel release surgery. (R. 723.)

On 5/24/13 Ms. Aranda was noted to be two weeks post right carpal tunnel release surgery. She noted improvement, but complained of worsening pain on the left side. Finger stiffness was noted on the right, so therapy was prescribed. (R. 322.)

On 7/8/13 Ms. Aranda presented for follow up on the right hand. She noted that she had undergone two sessions of therapy and was discharged. She was using the right, but developed pain along the carpal tunnel areal. She decided to delay the left side surgery until the right felt better. (R. 317.) The doctor indicated that this pain could be normal, but usually resolves within three months. (R. 318.)

On November 20, 2013, Ms. Aranda had left carpal tunnel release surgery. (R. 725.)

A progress note dated 12/7/13 noted that Ms. Aranda was two weeks post left carpal tunnel release surgery. Therapy was prescribed. (R. 314.)

On 1/7/14 Ms. Aranda presented for a 6 week follow up for her left carpal tunnel surgery. She noted soreness in the carpal tunnel area with triggering in the left long finger that was painful. Objective findings included tenderness and triggering. The soreness was noted to be similar to the right side and was thought to improve. Options for trigger finger included surgery and injections. (R. 311.)

On 1/22/14, Ms. Aranda had a left trigger finger release surgery. (R. 727.)

On 2/6/14 Ms. Aranda was noted to be two weeks post trigger finger release. She was noted to have good range of motion and did not need therapy. (R. 320.)

On 4/15/14, Ms. Aranda returned to the doctor complaining of soreness in the left trigger finger, but no triggering. She also noted pain in both hands and wrists with lifting, washing, and doing many normal activities. Her diagnoses were carpal tunnel syndrome and migraine headaches. (R. 332.) Objective testing revealed tenderness and soreness in both hands and wrists. (R. 333.) A rheumatology consult was suggested to look for an underlying inflammatory process due to her history and past treatment for these conditions. (R. 334.)

4

On 5/6/14, Ms. Aranda attended a Rheumatology consult. She noted wrist pain with swelling. She also described intermittent neck pain associated with migraines. (R. 625.) Her system review was positive for joint pain and headaches. Objective findings included joint pain in the hands. (R. 627.)

On 5/6/14, Ms. Aranda had x-rays of her hands and knees. (R. 705.) These showed mild degenerative changes in both knees, worsening on the right, and bilateral mild degenerative changes of the hands. (R. 706.)

On October 11, 2014, Ms. Aranda attended a consultative exam for her carpal tunnel. Objective testing showed reduced grip strength. The examiner noted that Ms. Aranda would have minimal difficulty with lifting, carrying, fine manipulation and handling small objects. (R. 337-344.)

On 8/26/14, Ms. Aranda established care with a new primary care provider. Her main complaints at the time were bilateral hand pain and stiffness. She noted that she can't twist or use hands for fine movements due to pain. She also reported feeling stress because of the limited use of her hands. (R. 354.) Objective findings included tenderness over the wrists. (R. 355.)

On 11/6/14, Ms. Aranda presented for a referral to physical therapy for her hands. She was unable to make a fist at this time due to pain. Tenderness was noted in the MCP joints. (R. 364.)

On 1/28/15, Ms. Aranda presented with complaints of knee pain for several years. She was referred back to rheumatology. X-rays were taken at this time showing increasing joint effusion on the right with increasing mild degenerative changes and very mild degenerative changes of the left. (R. 715.)

On 8/3/15, Ms. Aranda was seen for a routine medical exam. At this exam she complained of pain her hands for the previous two years. She felt that her carpal tunnel had returned with

exacerbated symptoms, including pins and needles, from cooking and brushing. She noted pain with even light work with the right worse than the left. In addition, Ms. Aranda noted migraines three times per month that lasted for two days, as well. (R. 376.)

On 9/14/15, Ms. Aranda presented with severe pain in her right forearm, noting stiffness in bilateral hands in the morning time. (R. 385.) Right elbow exam revealed tenderness of lateral epicondyle and on stress of fingers suggestive of lateral epicondylitis. (R. 386.)

On 12/4/15, Ms. Aranda presented for a follow up. She noted that she was continuing physical therapy. She indicated that therapy helps her epicondylitis. However, it goes back to being painful soon after the therapy session. She also reported pain and grip weakness in the right hand. Her left hand was sore around the trigger finger surgery. She experiences numbness in both hands, especially in the morning. (R. 389.)

On February 5, 2016, Ms. Aranda presented for a follow up of hand pain. She also reported that she was having a migraine with light sensitivity and nausea. She reports having migraines for years, but can't afford the medication she was prescribed. (R. 393.) Objective testing showed positive carpal tunnel compression and Phalan's tests. She was diagnosed with Migraines and given a prescription for Imitrex. (R. 394.) In addition she was referred to orthopedics for treatment of her carpal tunnel. (R. 395.)

On 3/17/16, Ms. Aranda again presented for hand pain. She reported stiffness in the morning. (R. 654.) Objective findings included stiffness and tenderness. Rheumatology follow up was recommended. (R. 655.)

On 3/22/16, x-rays of the hands were taken showing bilateral mild osteoarthritis. (R. 667.) She also attended a rheumatology follow up this day. She reported worsening hand and wrist pain. (R. 669.) Ms. Aranda also reported intermittent headache, dizziness, weakness, and paresthesias.

(R. 670.) Objective findings included tenderness and decreased range of motion. (R. 671.) Diagnoses included hand and wrist pain, migraine, and elevated blood pressure. (R. 672.)

On 4/5/16 Ms. Aranda presented to rheumatology for a follow up. She continued to experience hand and wrist pain with the middle fingers being most painful. (R. 681.)

### f. April 29, 2016, Administrative Law Judge Hearing

Ms. Aranda appeared before ALJ Johnson on April 29, 2016, represented by Attorney James Brzezinski. (R. 34). Ms. Aranda testified at the hearing. Richard Fischer appeared at the hearing and testified as a vocational expert. (Id.) Dr. Sai Nimmagadda appeared at the hearing and testified as a medical expert. (Id.)

Ms. Aranda testified that she stopped working in February of 2014 after she had multiple carpal tunnel surgeries. (R. 40.) She testified that she continued to have pain, swelling, and tingling even after her surgeries. (R. 41.) She reported that when she tries to grasp, lift, or even brush her hair she starts to feel pain. (R. 44.) She also indicated that the pain never goes away. (R. 45.) Her son even brushes her hair and teeth. (Id.)

Ms. Aranda testified that, among other things, typing was very difficult at work. (R. 55.) She also testified that she had to leave work multiple times due to headaches. (R. 54.)

The Medical Expert (ME), Dr. Nimmagadda, testified that Ms. Aranda is diagnosed with bilateral carpal tunnel, migraine headaches, and obesity. (R. 59.) The ME also verified that all of these conditions were severe. (R. 60.) The medical expert indicated that as a result of the carpal tunnel syndrome, Ms. Aranda would be limited to occasionally lifting ten pounds, frequently lift less than ten pounds, stand and/or walk six hours, sit six hours, push and pull occasionally, ramps and stairs occasionally, ladders ropes and scaffolds never, balancing, stooping, kneeling,

crouching, and crawling frequently, and handling, fingering, and feeling occasionally to frequently. (R. 60.)

The Vocational Expert (VE), John Fischer, testified that Ms. Aranda's past work was as a property manager, which is light and skilled with an SVP of 5, DOT number 186.167-018 and a receptionist which is sedentary and semi-skilled with an SVP of 4 DOT number 237.367-038. (r. 64.)

The vocational expert then given the following hypothetical: lift ten pounds, frequently lift less than ten pounds, stand and walk six hours and sit for six hours, push and pull occasionally with upper extremities, occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, frequently balance, stoop, kneel, crouch, and crawl, occasionally handle, finger, and feel bilaterally, and occasional exposure to moving mechanical parts, unprotected heights, commercial driving, and vibration. Based on this hypothetical, the VE indicated that this would limit the claimant to sedentary work, and that she would not be able to perform any past work. (R. 65.) The VE then indicated there were only two jobs available with those restrictions. They were call out operator DOT 327.367-014 and surveillance system monitor 379.367-010. (Id.)

### g. The Decision of The Administrative Law Judge

ALJ Johnson found that the severe impairments were bilateral carpal tunnel syndrome, osteoarthritis, and obesity. (R. 19). The ALJ found Ms. Aranda's migraines and knee condition to be non-severe. (R. 20.)

The ALJ gave the following residual functional capacity: sedentary work: occasionally lift 10 pounds; frequently lift less than ten pounds; stand/walk for 6 hours; occasionally push or pull with the upper extremities; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; occasionally handle, finger, and feel

bilaterally; and have occasional exposure to moving mechanical parts, unprotected heights, commercial driving, and vibration. (R. 21.)

Based on this hypothetical, the ALJ denied the claim indicated that the claimant would have the residual functional capacity to perform the occupations given by the VE of surveillance system monitor, and call out operator. (R. 26)

### h. Standard of Review

Decisions by ALJ's are reviewed by the federal courts with deference. However, if there is an error of law, or the ALJ's decision is not supported by substantial evidence, the ALJ's decision will not be upheld. 42 U.S.C. § 405(g); *see Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence is defined as when "a reasonable mind might accept [it] as accurate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 91 S.Ct. 1420, 1427 (1971), (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)). However, the federal courts cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgement for that of the Commissioner" when evaluating issues of substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Remand is required when an ALJ fails to consider a relevant line of evidence. *Flores v. Massanari*, 19 F. App'x 393, 400 (7th Cir. 2001). While an ALJ is not required to address every single piece of evidence, the ALJ is required to "build an accurate and logical bridge from the evidence to her conclusion." *Clifford*, 227 F.3d at 872.

### i. Five Step Sequential Evaluation

There is five step sequential evaluation used by ALJ's to analyze claims before the Social Security Administration. 20 C.F.R. § 404.1520. If an ALJ cannot proceed to the next step in the

9

sequential evaluation because any requirement of a particular step cannot be met, the ALJ must deny the claimant. 20 C.F.R. § 404.1520(4).

At step one, ALJ must determine whether the claimant is engaging in substantial gainful activity (SGA). 20 C.F.R. § 404.1520(b). SGA is defined as "doing significant physical or mental activities . . . even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is defined as "work activity you do for pay or profit." 20 C.F.R. § 404.1572(b). Activities such as taking care of oneself, cleaning your home, or attending school are not considered to be SGA. 20 C.F.R. § 404.1572(c). Social Security will typically determine if work activity is at the level of SGA by looking at a claimant's gross earnings by month. 20 C.F.R. § 404.1574(1); *Substantial Gainful Activity*, Social Security Administration (November 1, 2015, 2:00 p.m.), www.socialsecurity.gov/OACT/COLA/sga.html.

At step two ALJ is required to determine which impairments, if any, are severe. 20 C.F.R. § 404.1520(c). Severe impairments are defined as a health condition that imposes "more than a minimal effect on the ability to do basic work activities." Social Security Regulation (S.S.R.) 85-28, 96-3p, and 96-4p. An impairment must also have lasted twelve months, or would be expected to last twelve months, or result in death, to be considered severe. S.S.R. 82-52.

At step three, ALJ must evaluate if any of the claimant's impairments, or combination of impairments, "meet" or "equal" the requirements of an impairment listed in 20 C.F.R. Part 404, 20 C.F.R. § 404.1526. To "meet" a listing, the claimant must have a condition described by the listings. Program Operations Manual System (POMS) 22001.020; 20 C.F.R. § 404.1525; 20 C.F.R. § 404.1526; 20 C.F.R. § 404.416.925. The condition must exactly meet the criteria described in the listing and the condition must also meet the durational requirement of twelve months. *Id*. To

10

"equal" a listing, the claimant's condition must be "at least equal in severity and duration to the criteria of any listed impairment." *Id*. It is not fatal to the sequential evaluation if a claimant does not "meet" or "equal" a listing. 20 C.F.R. § 404.1520(e). An ALJ must find a claimant disabled under the listings or, in the alternative, under the medical and vocational guidelines described in step four and five below. 20 C.F.R. § 404.1520.

Before proceeding to step four, ALJ must determine the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e). The RFC is the most a claimant can do, both physically and mentally, given her or her health condition(s). *Id*.

At step four ALJ must if the claimant would be able to perform her or her past relevant work (PRW) based on the RFC. 20 C.F.R. § 404.1520(f). Past relevant work is generally defined as a job or work activity that the claimant performed within past fifteen years which provided the claimant with work skills and experience to be able to return to that previous job. S.S.R. 82-62. An ALJ may request testimony from a VE to clarify and resolve any issues at step four. S.S.R. 00-4p.

Lastly, at step five, ALJ must evaluate if the claimant would be able to perform any other work in the economy based on her or her RFC. 20 C.F.R. § 404.1520(g). Of note, nothing in step five of the sequential evaluation requires an ALJ to consider whether or not the claimant could find or get a job, rther, the ALJ must decide if the claimant is physically and mentally capable of performing a job in the national economy based on her or her education and past work experience. *Social Security Administration,* How We Decide if You Are Disabled (November 4, 2015, 12:46 pm). Like in step four, an ALJ may request testimony from a VE to clarify and resolve any issues at step five. S.S.R. 00-4p.

Also, when a claimant is over the age of fifty, Appendix 2 to Subpart P of Part 404 – Medical Vocational Guidelines could be applicable at step four and five. Specifically, tables one, two, and three describe various situations in which a finding of disability is directed based on the claimant's age, education level, and previous work experience.

II.  **Statement of Errors:**

 a. **The Vocational expert relied on out of date information to formulate his opinion. As such his opinion was unreliable, and reliance on that opinion is grounds for reversal.**

Due to the Ms. Aranda's physical limitations, particularly in handling and fingering, she would not be able to perform the requirements of being a Call-Out Operator.

The Vocational Expert (the "VE") testified that "given the residual functional capacity, the claimant's past relevant work [can] no longer be performed." (R. 25). The plaintiff's past work included a position as a property manager and a receptionist. (*Id.*) The receptionist position sits at the crux of the issue here. As Judge Cole pointed out in his Order, it is not clear why the plaintiff could perform as a Call-Out Operator but not a receptionist when they seem to have similar demands. (Order, 3). The Commissioner accounts for this discrepancy in logic by stating that, according to the Dictionary of Occupational Titles (the "DOT"), a receptionist handles frequently, while a Call-Out Operator involves only occasional handling, which the Residual Functional Capacity Assessment (the "RFC") determined tolerable for the plaintiff. (Commissioner Brief, 9). Though this seemingly plugs the hole in logic from the ALJ's decision, a flaw exists in the underlying information used to draw that conclusion. The requirements of a receptionist and a Call-Out Operator are presumably more similar than the rigid and outdated DOT suggests.

12

The plaintiff was found unable to perform the duties required for her former job as a receptionist (R. 25), and therefore, she would not be able to perform the duties required of a Call-Out Operator. According to the DOT, a receptionist's main duties are answering and directing phone calls. Dictionary of Occupational Titles, 237.367-038, Lexis.com. Other duties which *may* be included in a receptionist's daily job are; typing memos, correspondence, reports, and other documents; and doing clerical work. *Id*. As for a Call-Out Operator, the DOT states the responsibilities include; compiling credit information using the telephone; copying information onto a form to update the information for credit record on file, or for computer input; and call subscribers to relay requested information or submit data obtained for typewritten report to subscriber. DOT, 237.367-014, Lexis.com. From the descriptions, it is hard to discern why under the DOT's "physical demands" descriptions, the receptionist position requires frequent handling, while the call-out operator only requires occasional handling; it would be assumed that both jobs would require frequent handling. This is likely what led to the VE's confusion in answering the question of "how the plaintiff could perform the job if she could only perform manipulations up to one third of the day." (R. 66). The real answer to the question is that the plaintiff could not perform the job and the discrepancy between the job description and the physical demands description that has led to the confusion is due to the fact that the DOT is outdated.

The last updated reference of the Call-Out Operator position was 1977; the description of duties therefore must be read from a forty-year-old perspective which should help solve some of the confusion. DOT, 237.367-014, Lexis.com. What the job would potentially entail today is not likely what a person would have been required to do in 1977. In fact, in reading the description under an adjusted lens, it seems possible that a call-out operator would only take the phone calls and write limited notes on a form while another person would update the records, input data into

the computer, and write reports to subscribers. *Id.* In this sense, there may have only been occasional handling by the Call-Out Operator in 1977. However, it should fairly be assumed today that all of those responsibilities would fall under the same position – the person who takes the calls is going to do the computer input and write the reports – the Occupational Outlook Handbook (the "OOH"), gives some weight to this assumption.

Under 20 C.F.R. § 404.1566(d), in determining the type of work that exists in the National Economy, the Social Security Administration will "take administrative notice of reliable job information available from various governmental and other publications," which under subsection (d)(5) includes the OOH. Because the OOH is much more up to date, it should serve as a better indication of the responsibilities of a Call-Out Operator in today's National Economy. There is not an actual code for the Call-Out Operator position, likely because it no longer exists, but there is a similar position that should serve just as well for comparison; a credit checker. The OOH has a broad group for financial clerks which includes a link to O*NET where more in-depth detailed job information can be found for specific positions that correspond with Standard Occupational Classification (SOC) codes. https://www.onetonline.org/link/summary/43-4041.02.

The code for a Credit Checker is 43-4041.02 and the general job description is "investigate history and credit standing of individuals or business establishments applying for credit. Telephone or write to credit departments of business and service establishments to obtain information about applicant's credit standing." *Id*. This seems to be fairly in line with the description of a Call-Out Operator. However, in the description of work activities, the credit checker is required to do the documenting and recording of information as well as interact with computers which includes; "[u]sing computers and systems . . . to program, write software, set

14

up functions, enter data, or process information" and "[e]ntering, transcribing, recording, storing, or maintaining information in written or electronic/magnetic form." *Id*. Because a Credit Checker seems to be an accurate representation of today's Call-Out Operator, the position now requires tasks that involve much more handling than what was required when the job description was last updated by the DOT.

The conclusion that the plaintiff can work as a Call-Out Operator is drawn from faulty reasoning based on a description of a job that may no longer actually exist in the form the DOT prescribed to it in 1977. In today's National Economy, it is unlikely that a person whose physical limitations would not allow them to perform the duties required of a receptionist, could perform the duties required of a call-out operator.

In a Social Security Disability claim, "[t]he Commissioner bears the step-five burden of establishing that the claimant can perform This work that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2); see also *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A VE's testimony can satisfy This burden only if that testimony is reliable. *Britton*, 521 F.3d at 803; *McKinnie v. Barnhart*, 368 F.3d 907, 910, 65 Fed. Appx. 80 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton*, 521 F.3d at 803." *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

In this case it seems as if the vocational testimony is seemingly based on outdated information from the DOT making this testimony unreliable. Where a finding is made based on unreliable VE testimony, as is the case here, the decision should be vacated.

15

**b. The ALJ improperly found the Plaintiff less than fully credible.**

In formulating the RFC, the ALJ took into consideration many factors including the plaintiff's personal testimony. (R. 21). It is the personal testimony aspect that is a cause for concern because disbelief in the plaintiff's personal testimony seems to have stemmed from a false pretense that the plaintiff's testimony was inconsistent. (R. 22, 23). Though disbelief alone is not enough to be a cause for reversal, according to the *Sarchet* court, disbelief based on flawed reasoning should be. *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996). The *Sarchet* court found that if the ALJ believed the medical reports finding Sarchet had enough strength to work, and did not believe Sarchet's testimony, that would compel a denial of the application for benefits. *Id*. at 307. However, they could not "uphold a decision . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Id*. Here, that logical bridge is lacking because the reason for disbelief was seemingly built off of the false perception that the plaintiff's testimony was inconsistent with medical and other records.

First, the ALJ found that the plaintiff claims that she is presently unable to work due to constant pain in both of her hands but the objective evidence documents that the plaintiff could "often make a full fist, exhibited full range of motion and her sensation was present to light touch in the radial, ulnar and median nerve distribution." (R. 23). The ALJ interprets this as inconsistent evidence but it is not. Pain is subjective and whether the plaintiff feels pain in her hand is not dictated by how well she can move it.

Second, the ALJ found that the plaintiff's testimony was inconsistent with what is reflected in the medical evidence because she testified that "her hand and wrist pain increased and she stopped cooking and cleaning in September 2015" but during an annual physical in

16

March 2016, she "reported her carpal tunnel symptoms had returned in her right hand a month ago." *Id*. Again, the evidence is not necessarily inconsistent. The ALJ failed to point out that in 2016 physical, the record shows that other than it being an annual physical, the chief compliant listed was, "pain in hands x 2 years" (R. 376); this by itself shows that the pain was occurring long before February 2016. The plaintiff does report that her carpal tunnel symptoms returned in her right hand a month before the appointment but the exact wording is "Doing well until sick with strep? A month ago. Now feels like carpal tunnel symptoms have returned in right hand. Most exacerbated by cooking, brushing." *Id*. A claim that she stopped cooking and cleaning in September 2015 is not directly inconsistent with the statement made at the physical. If she stopped doing the things that exacerbated her symptoms, it could explain her period of "doing well" sometime after September 2015, until the strep occurred along with the return of the symptoms in February 2016.

These small perceived inconsistencies do not seem to be of much importance until viewed in light of the domino effect they had on the ALJ's frame of reference ultimately leading to an RFC that may not be totally accurate. The ALJ's view that the plaintiff's testimony lacked consistency with the record, led to a skepticism about testimony regarding her symptoms; "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence." (R. 22). The skepticism on the part of the ALJ would explain why a woman who testified that, due to her symptoms, is no longer able to cook, clean, shop for groceries, button her clothes, or brush her hair or teeth, was found in the RFC to be able to perform a job that requires occasional handling and fingering. *Id*.

17

The ALJ's perception of inconsistencies in some of the plaintiff's testimony seems to have led to general disbelief in the plaintiff's entire testimony which effected the weight that was given to that testimony in formulating an RFC and therefore under *Sarchet*, a logical bridge was not created.

### c. The ALJ erred in her finding that the claimant's migraine headaches and bilateral knee condition were not severe conditions at Step 2.

The Seventh Circuit has indicated that in determining whether a condition is severe for purposes of Step 2 "the ALJ assesses its functionally limiting effects by evaluating the objective medical evidence and the claimant's statements and other evidence regarding the intensity, persistence, and limiting effects of the symptoms," while also noting that other circuits describe Step 2 as "a *de minimis* screening for groundless claims. **Thomas v. Colvin**, 826 F.3d 953, 960 (7th Cir. 2016).

In this case ALJ noted in her decision that Ms. Aranda suffered from migraine headaches and a right knee condition. However, the ALJ indicated that these conditions were non-severe as "there were no significant objective findings in the record to support more than minimal limitations on the claimant's ability to perform work activities." (R. 20.) This is inconsistent with the medical record.

On numerous occasions Ms. Aranda complained of her migraine headaches to her physicians. (See R. 332, 376, 393, & 625) She reported to her doctors that she experienced migraines three times per month that can last for two days. (R. 376.) At one visit, she was even experiencing a migraine with photosensitivity and nausea. (R. 393.) She was even prescribed medication for migraines, although she couldn't afford it. (Id.) Ms. Aranda then testified that she had to leave work early on numerous occasions due to her headaches. (R. 54.)

18

With respect to the knee conditions, Ms. Aranda had two x-rays over the relevant period demonstrating some degree of degenerative joint disease in her knees, and in fact, the x-rays showed that her right knee was worsening. (R. 705, 715.) These objective findings demonstrate that her knee was a concern for her and her physicians. In addition, she testified that she was having trouble walking and even falling due to her knee locking. (R. 48.)

As mentioned above, an ALJ is required to discuss objective findings and subjective complaints when determining whether a condition is severe, which we concede was done for the right knee condition. Although, we would argue this was done incorrectly, as the x-rays along with Ms. Aranda's complaints should constitute a finding that her right knee condition is severe.

However, with respect to the left knee and the migraine headaches, nowhere in the decision are the medical records or subjective statements related to these conditions evaluated. It is not even mentioned anywhere in the decision that Ms. Aranda has a left knee condition. The migraines are mentioned, however none of the medical records nor the testimony related to her migraines is discussed. This clearly a violation of the rule outlined in *Thomas v. Colvin,* as the ALJ did not assess the objective findings or the claimant's statements as is required.

**III.    Statement of Relief**

Based on the above cited reasons, the decision of the ALJ is not supported by the substantial evidence. As such, Ms. Aranda respectfully prays that you reverse the findings of the ALJ and award benefits to Ms. Aranda. In the alternative Ms. Aranda prays that your remand her claim for further proceedings with the Social Security Administration pursuant to sentence four under 20 U.S.C. § 405(g) for the reasons discussed above.

Dated: December 26, 2017

Respectfully submitted,
**MARIA ARANDA**

By: /s/ Joshua Kons
Joshua Kons
Law Offices of Joshua B. Kons
939 W. North Ave, Suite 750
Chicago, IL 60642
Telephone (312) 757-2272
Fax: (312) 757-2273
joshuakons@konslaw.com

*Attorney for Plaintiff*